UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH L. QUILDON, JR.,          :
                                 :
          Plaintiff              :     No. 1:12-CV-2325
                                 :
     vs.                         :     (Judge Caldwell)
                                 :
CAROLYN W. COLVIN, ACTING        :
COMMISSIONER OF SOCIAL           :
SECURITY,                        :
                                 :
          Defendant              :

MEMORANDUM AND ORDER

BACKGROUND

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Joseph L. Quildon, Jr.'s claim for social

security disability insurance benefits and supplemental security

income benefits.

        Disability insurance benefits are paid to an individual

if that individual is disabled and "insured," that is, the

individual has worked long enough and paid social security taxes.

The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It is

undisputed that Quildon met the insured status requirements of the

Social Security Act through December 31, 2012. Tr. 19, 21 and

125.[1]

        Supplemental security income is a federal income

supplement program funded by general tax revenues (not social

_____

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant on January 22, 2013.

security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Quildon protectively filed[2] an application for disability insurance benefits on December 4, 2008, and an application for supplemental security income benefits on December 30, 2008. Tr. 19, 85-86, 125 and 110-124.  On May 26, 2009, the Bureau of Disability Determination[3] denied Quildon's applications. Tr. 19 and 89-97. On June 3, 2009, Quildon requested a hearing before an administrative law judge. Tr. 19 and 98-99.  After about 11 months had passed, a hearing was held on May 7, 2010. Tr. 34-65.  On June 22, 2010, the administrative law judge issued a decision denying Quildon's applications. Tr. 19-30. As will be explained in more detail *infra* the administrative law judge found that Quildon had the capacity to perform a limited range of sedentary work[4] and identified three positions, a visual

---

2.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 89 and 93.

4.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as
(continued...)

inspector, bench assembler and surveillance monitor, which Quildon
could perform. Tr. 29. On August 17, 2010, Quildon requested that
the Appeals Council review the administrative law judge's decision
and after about 25 months had elapsed the Appeals Council on

---

4.   (...continued)
follows:

> (a) *Sedentary work.* Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work.*  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work.*  Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.

> (d) *Heavy work.*  Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he or she
> can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

September 27, 2012, concluded that there was no basis upon which to grant Quildon's request for review.  Tr. 1-5 and 13-15.

Quildon then filed a complaint in this court on November 20, 2012.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on April 23, 2013, when Quildon filed a reply brief.

Quildon was born in the United States on December 8, 1965, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c); Tr. 41, 85-86 and 117.

Quildon, who graduated from high school and then completed two years of college in February, 1987, can read, write, speak and understand the English language and perform basic mathematical functions.  Tr. 142, 148 and 162.  During his elementary and secondary schooling, Quildon attended regular education classes. Tr. 148.

Quildon has past relevant employment as a bus driver for the New York City Transit Authority which was described as semi-

5.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

6.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing and the administrative law judge's decision Quildon was 44 years old.

skilled, medium work by a vocational expert.[7]  Tr. 28, 58, 144 and
130-132.

Records of the Social Security Administration reveal
that Quildon had earnings in the years 1982 through 1983 and 1985
through 2008, a total of 26 years. Tr. 106. Quildon's average
earnings during those years were $34,449.70. Id.  Quildon's
earnings ranged from a low of $247.85 in 2008 to a high of
$63,425.97 in 2001. Id.  Quildon's total earnings were
$895,692.34. Id.  However, Quildon's reported earnings in 2007
($9642.33) and 2008 were from accrued sick leave, vacation time
and withdrawal of funds from a 401K retirement plan. Tr. 38.

Quildon contends that he became disable on December 29,
2006, because of both physical and mental impairments. Tr. 110,
117 and 143.  Quildon identified depression as his mental health
impairment and the pain associated with arthritis and a back and
ankle injury as his physical impairment. Tr. 38-39, 143 and 172.
Quildon claims that he is unable to stand, walk or sit for long
periods of time; he cannot carry heavy objects; and he suffers

---

7.  Past relevant employment in the present case means work
performed by Quildon during the 15 years prior to the date his
claim for disability was adjudicated by the Commissioner.  20
C.F.R. §§ 404.1560 and 404.1565. The vocational expert also
testified that Quildon had past relevant work as a mail carrier
for the United States Postal Service which was described as semi-
skilled medium work and the administrative law judge so found.
Tr. 28 and 58.  However, the record reveals that Quildon last
worked for the U.S. Postal Service in 1990 which is not within
the 15-year period for consideration as past relevant work. Tr.
130, 144 and 151. This error is of no significance because both
positions are classified as semi-skilled, medium work.

from constant pain which causes him to be depressed. Tr. 143.  The
impetus for Quildon's alleged disabling impairments was a motor
vehicle accident that occurred on December 29, 2006, which also
aggravated some pre-existing conditions sustained in a 2005 motor-
vehicle accident. Tr. 38-39, 143 and 195.  Quildon last worked on
December 28, 2006. Tr. 143.

      The record reveals that Quildon is 6'5" tall and weighs
over 400 pounds.  Tr. 37 and 142. The record further reveals that
his weight was over 400 pounds well prior to his 2006 motor
vehicle accident. Tr. 194.  A person of such height and weight is
considered morbidly obese.  Quildon at the administrative hearing
admitted that the ankle fracture which he sustained in the 2006
motor vehicle accident had healed and that his main problems were
residual ankle stiffness, back pain, periodic numbness down the
inner thigh of the right leg into the knee, left hip pain, and
depression.  Tr. 39, 50-51 and 53. Quildon also testified that the
pain medications only take the "edge off" of his pain and they
make him "very drowsy" and he sometimes passes out. Tr. 45.  When
asked why he could not perform a sedentary job where he could sit
and stand at will, he testified that he has constant pain and that
he has to periodically lay down to relieve his pain. Tr. 57.

      In documents filed with the Social Security
Administration as well as during his testimony at the
administrative hearing Quildon stated that he lives in a house
with his mother who suffers from advanced Alzheimer's disease. Tr.

6

41 and 159-160.  Quildon stated that he was the primary care giver
for his mother, including preparing meals and cleaning for her.
Tr. 41-42 and 160.  Quildon stated that he had no problems with
personal care, including bathing, shaving, feeding himself, and
using the toilet, except difficulty putting on socks. Tr. 160.
Quildon needs no reminders to take care of personal items or take
medicines. Tr. 161.  Quildon is able to engage in shopping,
housecleaning, cooking and driving short distances. Tr. 161-162.
Quildon's hobbies include watching TV, chess and playing cards.
Tr. 163.  Quildon admitted that he socializes with other
individuals, including sometimes playing cards, drinking and
talking with others in person and by way of a computer. Id.  When
asked to identify items on a disability form which were affected
by his illnesses or conditions, Quildon checked lifting,
squatting, bending, standing, reaching, walking, sitting, kneeling
and stair climbing but did not check talking, hearing, seeing,
memory, completing tasks, concentration, understanding, following
instructions, using his hands, and getting along with others. Tr.
164. Quildon at the administrative hearing testified that he used
a cane for stability and to minimize his back pain. Tr. 52.

     Quildon in his appeal brief has mentioned that the
Commissioner with respect to a subsequent application for
disability insurance benefits awarded him benefits commencing on
June 23, 2010, one day after the adverse decision by the
administrative law judge which is the subject of the present

appeal. The issue in this appeal is whether or not substantial evidence supports the decision of the administrative law judge that Quildon had the ability to engage in a limited range of sedentary work at the time of the administrative hearing and prior thereto.

        For the reasons set forth below we will affirm the decision of the Commissioner.

**STANDARD OF REVIEW**

        When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court

8

if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or

fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

10

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the

---

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

9.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

requirements of a listed impairment,[10] (4) has the residual

functional capacity to return to his or her past work and (5) if

not, whether he or she can perform other work in the national

economy. Id.  As part of step four the administrative law judge

must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary

work setting on a regular and continuing basis.  See Social

Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A

regular and continuing basis contemplates full-time employment and

is defined as eight hours a day, five days per week or other

similar schedule. The residual functional capacity assessment must

include a discussion of the individual's abilities.  Id; 20 C.F.R.

§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

---

10.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience."  Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

11.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records. We will commence with Quildon's medical records that predate December 29, 2006, the date Quildon alleges that he became disabled.

The record reveals that Quildon received chiropractic care from Concetta A. Butera, D.C., of Brooklyn, New York, on April 26 and 30, 2003, a year in which Quildon earned $61,177.39, working as a bus driver. Tr. 126 and 222. The record of these two appointments is barely legible but we can discern that Quildon at that time was complaining of neck and low back pain, stiffness and soreness and muscle spasms. Tr. 222. After those two chiropractic treatments we do not encounter any other records from Dr. Butera until early 2005. Tr. 221. From March 16, 2005 and up until December 22, 2006, Quildon had at least 60 appointments with Dr. Butera. Tr. 186-187, 194 and 203-221. The records from Dr. Butera are mostly illegible but it is clear that Quildon was complaining of neck and low back pain and was being treated for those conditions.

13

In 2005, Quildon earned $34,299.59, and in 2006 he earned $35,827.04 working as a bus driver. Tr. 126.

On or about March 25, 2005, Dr. Butera referred Quildon for a series of x-rays of the lumbar spine and pelvis. Tr. 201-202. The x-rays of the lumbar spine revealed minimal degenerative changes of the thoracolumbar spine and slight narrowing of the intervertebral spaces at the T12-L1 and L1-L2 levels. Tr. 201. The x-rays of the pelvis revealed a benign bone lesion (osteochondroma) located on the right iliac crest.[12] Tr. 202.

On August 26, 2006, Quildon underwent a series of x-rays of the cervical, thoracic and lumbar spines based on an order from Dr. Butera.  The x-rays of the cervical spine were reported as normal. Tr. 191. The thoracic spine x-rays revealed multilevel degenerative changes involving anterior bone spurs, osteophytes, and no evidence of acute fracture or dislocation of the mid or lower thoracic spine but it was noted that the study was limited because of Quildon's body habitus. Tr. 192.  The lumbar spine x-rays revealed mild degenerative changes and no acute findings. Tr. 193. Again it was noted that the study was limited because of Quildon's body habitus. Id.

───────────────

12.  The iliac crest is a curved ridge along the top of the largest hip bone, the ileum.

A chiropractic treatment note dated August 8, 2005, from Dr. Butera reveals that Quildon weighed 435 pounds and that he was involved in a work-related motor vehicle accident on August 1, 2005. Tr. 195.  As a result of injuries sustained in that accident Quildon on or about September 14, 2006, was awarded 10.6 weeks of workers' compensation benefits by the Workers' Compensation Board of the State of New York covering the period March 24, 2006 to June 7, 2006. Tr. 233. The total amount of the award was $4240.00. Id.

Chiropractic examination notes from Dr. Butera dated October 20, 2005, and February 9, 2006, reveal that Quildon weighed 435 pounds. Tr. 186-187.  In a letter to Transamerica Insurance Company on November 9, 2005, Dr. Butera stated that he diagnosed Quildon as suffering from the following 14 conditions: (1) status post cervical strain or sprain injury; (2) cervical vertebral dysfunction; (3) cervical radiculopathy; (4) cervical paravertebral muscle spasm; (5) straightening of cervical lordosis; (6) status post thoracic strain or sprain injury; (7) thoracic vertebral dysfunction; (8) thoracic radiculopathy; (9) status post lumbosacral strain or sprain injury; (10) thoracic and lumbosacral paravertebral muscle spasm and splinting; (11) lumbosacral vertebral dysfunction; (12) bulging disc and disc dessication of L3-L4 with flattening of the thecal sac; (13)

15

herniated disc and disc dessication at L5-S1 abutting the
descending nerve root; and (14) instability of the lumbosacral
spine.[13] Tr. 223.

On September 8 and December 27, 2005, and January 5 and
May 8, 2006, Quildon had appointments with Fred Montas, M.D.,
located in Brooklyn, New York. Tr. 182-184. The treatment notes of
these appointments are totally illegible other than we can discern
that Quildon on September 8, 2005, complained of headaches, neck
pain, middle and lower back pain and numbness in the right leg.
Tr. 182.

On September 22, 2005, Quildon underwent an MRI of the
cervical spine which revealed straightening of the cervical
lordosis (the normal curvature of the cervical spine) possibly
reflecting the presence of muscle spasm or possibly related to
Quildon's large body habitus. Tr. 188.  The cervical discs were
normal in height and contour without bulging or herniation. Id.
There was no evidence of fracture, dislocation or subluxation. Id.

_____

13. A chiropractor is not an "acceptable medical source" under
the Social Security regulations "to establish whether [a
claimant] has a medically determinable impairment." 20 C.F.R. §
404.1513(a).  A chiropractor may be considered an "other source[]
to show the severity of [a claimant's] impairment(s) and how it
affects [the claimant's] ability to work." 20 C.F.R. §
404.1513(d). Dr. Butera did not provide a functional assessment
at any point regarding Quildon's work-related functional ability,
including his ability to sit, stand, walk, and lift or carry
items.

Also, on September 22, 2005, Quildon underwent and MRI of the lumbar spine which revealed dessication and mild bulging of the L3-L4 disc associated with minimal flattening of the thecal sac;[14] and dessication and a right posterolateral disc herniation at the L5-S1 level abutting the descending nerve root. Tr. 190-191.

On December 30, 2006, after the alleged disability onset date, Quildon was transported by way of ambulance to the Pocono Medical Center Emergency Department after he was involved in a motor vehicle accident. Tr. 247-253.  Quildon allegedly fell asleep at the wheel, ran off the road and crashed into a tree. Tr. 247.  Upon arrival at the emergency department it was reported that Quildon was involved in the accident 1 hour prior to arrival, he was the driver of the vehicle and he was not wearing his safety belt. Id.  Also, there was an odor of alcoholic beverage on his breath.[15] Id.  Quildon denied any pain other than some discomfort in his left ankle and some chest pain on the right side. Tr. 248-250.  Quildon had full range of motion of the neck; he denied paresthesias (pins, needs, tingling) and extremity weakness; he

14.  The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

15.  Subsequent laboratory tests revealed that Quildon had a alcohol level of 0.17%,  twice the legal limit. Tr. 252. The legal limit in Pennsylvania is .08 percent.  75 Pa.C.S.A. § 3731.

had no obvious signs of trauma to the back; he rated his pain as a 3 on scale of 1 to 10; he had full range of motion of the upper extremities and his sensation was intact; he had a small abrasion to the left wrist but denied pain and there was no deformity; he had full range of motion of the lower extremities; and he denied depression. Tr. 248-252. The results of a physical examination were essentially normal other than some diffuse tenderness over the right side of the chest and tenderness over the medial malleolus of the left lower extremity(the bony prominence on the inner side of the ankle). Tr. 251-252. It was reported that Quildon was oriented to person, place and time and had a normal affect. Tr. 252.  Various diagnostic tests were ordered, including x-rays of the left ankle. Tr. 248 and 252. The x-rays of the left ankle revealed an "oblique minimally displaced fracture of the medial malleolus." Tr. 255. After the physical examination and x-rays, the diagnostic assessment was that Quildon suffered from a fracture of the left ankle. Tr. 252.  A splint was applied to Quildon's left ankle; he was advised to take ibuprofen over the counter, and he was given a prescription for Percocet 1-2 tablets every 4-6 hours as needed. Tr. 252.  At discharge from the hospital, he was also advised to follow-up with an orthopedic physician within 1 week. Id.

18

On January 8, 2007, Quildon had an appointment with Christopher DiPasquale, D.O., an orthopedist with Mountain Valley Orthopedics, P.C., located in East Stroudsburg, Pennsylvania. Tr. 431-430.  Quildon told Dr. DiPasquale "he was a restrained passenger" in the vehicle but oddly it is than reported Quildon stated that he "fell asleep and struck a tree." Tr. 431. Quildon told Dr. DiPasquale that his pain in the ankle was presently "mild." Id. When Dr. DiPasquale reviewed Quildon's systems, Quildon reported "recent body aches, constant bothersome cough, pain, tightness or pressure in the front or back of the chest, back/neck pain, [and] weight loss." Id.  All other systems were negative. Id.  It was noted that Quildon had a prior medical history of asthma. Id.  Quildon's current medications included oxycondone and albuterol. Id.  A physical examination of Quildon by Dr. DiPasquale revealed that Quildon was "well-developed, well-nourished, awake, alert and oriented." Id.  Quildon was wearing a U-splint on the left ankle and using a cane. Id. He weighed 424 pounds. Id. There was tenderness along the medial aspect of the left ankle. Id. However, there was no swelling and he had intact pulses and sensation to light touch in the lower extremities. Id. Dr. DiPasquale reviewed recent x-rays of Quildon's ankle and noted that he had "a mildly displaced medial malleolus fracture." Id. His diagnostic assessment was "[l]eft ankle medial malleolus

19

fracture." Id. Dr. DiPasquale ordered a CT scan of the left ankle to further evaluate the fracture and determine whether or not Quildon needed surgery. Tr. 430. However, Dr. DiPasquale in the same document refers to ordering a CT scan and than inconsistently states that he will see Quildon in a follow-up appointment after he receives the results of an MRI. Id. Quildon was placed in a splint with instructions to remain absolutely non weight bearing and he was given a prescription for crutches. Id.

After reviewing a CT study of Quildon's left ankle, Dr. DiPasquale had a telephone conversation with Quildon on January 10, 2007, and recommended surgery because of the amount of displacement of the medial malleolus fracture. Tr. 428-429. Dr. DiPasquale then performed a complete physical of Quildon on January 11, 2007, and again recommended surgery. Id. Quildon agreed initially to have the surgery performed and it was scheduled for January 12, 2007, at the Pocono Medical Center. Id. Quildon, however, on January 12, 2007, contacted the Pocono Medial Center and reported that he did not have transportation. Tr. 428. Consequently, the surgery was cancelled and an appointment scheduled with Dr. DiPasquale for January 16, 2007. Id.

At the appointment on January 16, 2007, x-rays were obtained which "demonstrate[d] minimal further displacement of the fracture" and Quildon reported that he ambulated on the ankle and

he was "not having much pain." Tr. 427. A physical examination
revealed that Quildon ambulated with crutches and was able to bear
weight on the left side. Id.  Dr. DiPasquale told Quildon that he
could "make [the fracture] better with surgery" but Quildon
declined surgery and opted for the use of an ankle boot where he
would remain non weight bearing. Id.  Dr. DiPasquale warned
Quildon that if it failed to heal or healed in an unacceptable
position, Quildon might have to have "surgery in the long run."
Id. Quildon voiced understanding and proceeded with the non-
operative treatment. Id.

An x-ray performed on or about January 23, 2007,
revealed "early callus formation at the fracture without further
displacement." Tr. 426.  After performing a physical examination
and reviewing an x-ray on February 6, 2007, Dr. DiPasquale stated
that Quildon's fracture was healing. Tr. 425.  On March 13, 2007,
Dr. DiPasquale converted Quildon to an air splint, and informed
Quildon that he could "weight-bear as tolerated" on his left foot
when wearing the splint. Tr. 424. On April 10, 2007, Quildon
reported bearing weight on his left ankle and reported only
occasional pain along the medial aspect of his ankle. Tr. 423. Dr.
DiPasquale assessed Quildon's gait as normal. Id.

A CT scan of Quildon's ankle performed on or about April
30, 2007, revealed that the fracture was healing but not

completely healed. Tr. 422. At an appointment on June 26, 2007,
Quildon had a normal gait and only "mild tenderness over the
medial ligamentous complex." Tr. 421. X-rays revealed a healed
fracture and Dr. DiPasquale's reported that the fracture was
healed. Id. Dr. DiPasquale recommended that Quildon undergo a
course of physical therapy and follow-up with a physicians
assistant in 3 weeks. Id. Furthermore, Dr. DiPasquale indicated
that Quildon would likely be able to return to work at that time.
Id.

Quildon followed up with Dr. DiPasquale's physicians
assistant, Jennifer Pendersen, on July 20, 2007. Tr. 418. Quildon
reported that he was unable to walk without his air splint because
of pain, and presented using a single-point cane. Id. He also for
the first time complained of low back pain. Tr. 420. Quildon
stated that his low back pain began approximately three weeks
prior to the appointment and radiated into his right side, but
denied any numbness or tingling. Id. Ms. Pendersen observed that
Quildon walked with an antalgic gait favoring his left lower
extremity. Id. She also observed that Quildon was awake, alert
and oriented to person, place and time and had an appropriate mood
and affect. Id. Quildon weighed 422 pounds. Tr. 418. Quildon had
mild tenderness diffusely along the lumbar spine; no tenderness in
the paraspinal musculature; negative straight leg raising tests in

both lower extremities; normal and symmetric reflexes in the lower extremities; and normal sensation, good pedal pulses and no redness, swelling or bruising in the lower extremities. Tr. 419-420. Ms. Pendersen assessed Quildon with a healed left ankle medial malleolus fracture and low back pain. Tr. 418-419. She recommended physical therapy and a short course of Celebrex to treat the low back pain. Tr. 419. She also recommended an MRI to further evaluate his low back pain. Id. With respect to the healed ankle fracture, she encouraged Quildon to wean himself off of the air splint. Tr. 418. After consulting with Dr. DiPasquale, Ms. Pendersen informed Quildon that they would defer to a functional capacity evaluation to assess his ability to return to work. Id.

On August 6, 2007, Quildon had an appointment with Dr. DiPasquale at Mountain Valley Orthopedics.[16] Tr. 416-417. Quildon reported that he felt that his ankle was getting better. Id. He complained of low back pain but denied radicular symptoms. Id. A physical examination revealed that Quildon walked with an antalgic gait favoring the left side and had bilateral paralumbar muscle tenderness. Id. Dr. DiPasquale reported that the MRI of Quildon's

_____

16. The medical records contained in the administrative were frequently out of order. The first page of the record of the August 6th appointment was at Tr. 417 and the second page at Tr. 416.

lumbar spine showed that he had mild degenerative changes, including a small herniation at L5-S1 with mild nerve root displacement, a small foraminal disc protrusion at L3-L4 and mild spinal stenosis at L3-L4 and L4-L5. Id.  Dr. DiPasquale's diagnostic impression was that Quildon had a healed left ankle fracture, left ankle pain and a lumbosacral sprain. Id.  Dr. DiPasquale recommended continued physical therapy for the left ankle and low back and scheduled a functional capacity evaluation. Tr. 416.

On October 2, 2007, Quildon had an appointment with Dr. DiPasquale at which Quildon continued to complain of pain in the left ankle and low back. Tr. 415. A physical examination revealed that Quildon weighed 422 pounds, walked with an antalgic gait favoring the left side and had decreased motion in the lumbar spine.[17] Id.  It was further observed that Quildon was oriented to person, place and time and had an appropriate mood and affect. Id. Dr. DiPasquale's diagnostic impression was that Quildon suffered from "[c]hronic lumbosacral sprain/left ankle pain/left ankle medial malleolus fracture." Id.  Dr. DiPasquale indicated that Quildon would continue with pain management for his back and that a follow-up appointment would be conducted after a functional capacity evaluation. Id.

---

17.  The degree of decrease in range of motion was not specified.

A functional capacity evaluation was performed at St. Luke's Neuroscience Center on October 4, 2007. Tr. 262-273. During that evaluation Quildon reported that during a 24 hour period he would sleep or be in a prone position for 14 hours, stand or walk for 2 hours and sit for 8 hours. Tr. 263.  Quildon also stated that he had a driver's license and could drive or ride in a car for 2 hours before needing a rest. Id.  Quildon reported ankle pain which radiated up his ankle. Id. The evaluator, Louise Kreider, a registered and licensed occupational therapist, observed that Quildon when standing placed most of his weight on his right foot. Id.  Ms. Kreider after administering multiply tests, some of which Quildon declined to perform, found with respect to Quildon's Validity Profile that because of Quildon's "very poor" test effort, the results were invalid.[18]  Tr. 273.

---

18.  Ms. Kreider in her report explained that

> the Validity Profile is comprised of a cohort of individual tests that collectively help determine whether or not the patient is exerting their best effort during all of the FCE tests.  Effort is defined as the physical ability and motivation to complete a task within the individual pain tolerance. A significant increase in pain is not required. If the patient exerts effort up to the point of a barely perceptible pain increase, or slightly below that level so that there is no pain increase at all, they will pass the overall Validity Profile. If the patient does not pass the overall Validity Profile, then they have not exerted their best effort.  The patient cannot assert that they were not able to exert their
> (continued...)

On October 12, 2007, Quildon had an appointment with Dr.
DiPasquale at which he continued to complain of left ankle and low
back pain. Tr. 413-414.  Objective physical examination findings
were limited. Id.  Quildon weighed 422 pounds; he walked with an
antalgic gait favoring the left lower extremity; and he had
tenderness over the medial malleolus of the left ankle. Tr. 413.
Quildon was oriented to person, place and time and he had an
appropriate mood and affect. Tr. 414. The diagnostic impression
was left ankle and low back pain. Tr. 413.  A CT scan of the ankle
was ordered by Dr. DiPasquale. Id.

The CT scan was performed on November 2, 2007, and
revealed no evidence of nonunion of the ankle fracture. Tr. 276.
On November 13, 2007, Dr. DiPasquale after examining Quildon and
reviewing the CT scan found that the left ankle fracture was
healed. Tr. 411.  Also, because Quildon was still complaining of

---

18.  (...continued)
          best effort due to pain since they are not asked to
          tolerate any pain increase at all, or at least no
          more than a barely perceptible increase, which
          everyone can perceive.  And since the patient is not
          asked to perform tasks for which they do not have the
          physical ability, or if they do not have the physical
          ability, then the test data should reveal that, then the
          only reason for not passing the overall Validity
          Profile is that the patient was not motivated to
          cooperate with the evaluation process and exert their
          best effort.

Tr. 271-272.

ankle pain Dr. DiPasquale administered a steroid injection to the ankle and gave Quildon a prescription for Darvocet for steroid flare.[19]  Id.  A follow-up appointment was scheduled in 4 weeks and an MRI of the ankle ordered. Id.

The MRI was performed on November 21, 2007, and revealed a healed ankle fracture and degenerative joint disease. Tr. 288 and 409.  At an appointment with Dr. DiPasquale on December 18, 2007, Quildon continued to complain of ankle pain and Dr. DiPasquale recommended that he see a foot and ankle surgeon for a second opinion. Tr. 409-410.

On February 12, 2008, Quildon had an appointment with Jason Rudolph, M.D., of Eastern Orthopaedic Group, located in Bethlehem, Pennsylvania for the second opinion. Tr. 294-295. After conducting a physical examination and reviewing x-rays and a recent MRI, Dr. Rudolph recommend a further CT scan of the left ankle to rule out the possibility of a nonunion of the fracture. Tr. 295.  Based on that recommendation Dr. DiPasquale on March 4, 2008, ordered a CT scan of Quildon's left ankle which was performed on April 2, 2008. Tr. 275 and 408.

---

19.  One side effect of a steroid injection can be pain at the injection site. This is known as a steroid flare and usually only a temporary reaction. It is thought that a small amount of the steroid crystallizes and cause additional pain. See, generally, Jonathan Cluett, M.D., What is a Cortisone Flare? Orthopedics, About.com, http://orthopedics.about.com/od/injectio2/f/cortisone flare.htm (Last accessed April 5, 2014).

On April 14, 2008, after examining Quildon Dr. Rudolph concluded that Quildon appeared to have chronic medial ankle pain with a healed medial malleolar fracture. Tr. 290.  Dr. Rudolph did not recommend surgery but offered to administer a cortisone injection to Quildon's ankle but Quildon refused. Tr. 290-291.

Quildon returned to Dr. DiPasquale on April 29, 2008. Tr. 406-407. Quildon reported ankle pain and back pain with paresthesias going down his legs. Tr. 407. Dr. DiPasquale offered Quildon an injection for his ankle but Quildon refused. Tr. 406. Dr. Dipasquale reported that Quildon had a normal gait and was oriented to person, place and time and had an appropriate mood and affect. Id.  Dr. DiPasquale opined that Quildon had reached maximum medical improvement and deferred the issue of his ability to work to the functional capacity evaluation.  Tr. 406.  Dr. DiPasquale referred Quildon to a neurosurgeon, Allister Williams, M.D., for an evaluation of his back pain. Id.

On July 25, 2008, Quildon returned to Dr. DiPasquale alleging that he was unable to work because of ankle and low back pain. Tr. 405. Dr. DiPasquale noted that Quildon arrived at the appointment using a cane with a mildly antalgic gait favoring the left lower extremity. Tr. 404.  Dr. DiPasquale reviewed x-rays of the left ankle and noted that the fracture was well healed with excellent position and alignment. Id. Dr. DiPasquale again

28

informed Quildon that his ankle had reached maximum medical improvement. Id.  Dr. DiPasquale told Quildon to see Dr. Williams for his back pain, noting that Quildon never followed through with his prior referral. Id.

On September 12, 2008, Quildon had an appointment with Dr. Williams. Tr. 400-402. Quildon reported that most of his back pain was localized at the lumbosacral junction. Tr. 402. A physical examination was performed which revealed that Quildon weighed 422 pounds; he had tenderness on palpation of the lumbar spine; he had full muscle strength in the lower extremities; he had normal sensation and reflexes in the lower extremities; he had negative straight leg raising tests in both lower extremities; and he had a normal, non-antalgic gait. Tr. 401. Dr. William stated that the greatest benefit for Quildon would be to lose weight. Id.

On September 24, 2008, Leo P. Potera, M.D., reviewed Quildon's medical records on behalf of the Bureau of Disability determination and concluded that Quildon had the ability to engage in a limited range of light work. Tr. 391-396.  Dr. Potera stated that Quildon could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and had an ability to push or pull with the lower extremities (other than limited to the weight designated for

29

lifting and carrying). Tr. 392.  Quildon also could occasionally use ramps and climb stairs but never climb ladders, ropes or scaffolds; he could occasionally balance, stoop, kneel, crouch and crawl; he had no manipulative, visual or communicative limitations; and with respect to environmental limitations he had to avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation and hazards (such as machinery and heights). Tr. 393-394.

Quildon underwent an MRI of the lumbar spine on September 25, 2008, which revealed mild degenerative disc disease at the L3-L4, L4-L5 and L5-S1 levels; small disc protrusions at the L3-L4 level causing moderate right foraminal narrowing; and a small disc protrusion at the L5-S1 level abutting and slightly displacing the right S1 nerve. Tr. 442.

Quildon had a follow-up appointment with Dr. Williams on October 27, 2008, at which Quildon reported back and neck pain, but denied any numbness, weakness or tingling. Tr. 398-399.  A physical examination revealed that Quildon weighed 422 pounds; he had tenderness on palpation of the lumbar spine; he had full muscle strength in the lower extremities; he had normal reflexes and sensation; and he had a non-antalgic gait. Tr. 398. Quildon was oriented to person, place and time and had an appropriate mood and affect. Id.  Dr. Williams stated that the MRI of the lumbar

spine revealed "multilevel spondylosis and disk space narrowing with mild stenosis."[20] Id.  Dr. Williams did not recommend surgery, and referred Quildon for facet block injections. Id. On December 26, 2008, Alex Perez, M.D., administered a lumbar epidural steroid block after which Quildon did not seek medical treatment until April, 2010. Tr. 438.

On April 23, 2009 Quildon was examined by Joyce Vrabec, D.O.,  on behalf of the Bureau of Disability Determination. Tr. 443-449. Dr. Vrabec examined Quildon on one occasion, and did not review any of Quildon's treatment records or diagnostic studies. Tr. 443-446. Dr. Vrabec noted that Quildon came to the appointment using a cane, but appeared to have a normal ability to walk. Tr. 445. Although Dr. Vrabec noted gait issues, she could not determine whether they were associated with Quildon's weight or pain. Tr. 443.  Dr. Vrabec documented a "questionably positive" straight leg raise test. Tr. 445. Dr. Vrabec opined that Quildon could carry twenty pounds occasionally, could sit for less than six hours, and could stand and walk for less than one hour. Tr.

---

20.  Degeneration of the vertebrae and intervertebral discs is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae. The term is frequently used to describe osteoarthritis of the spine. Stenosis can refer to the narrowing of the neural foramen (the openings along each side of the spine through which nerve roots exit) and also the spinal canal.

447-448.  A vocational expert testified that if Dr. Vrabec's
assessment relating to Quildon's ability to stand, walk and sit
was accepted Quildon would not be able to engage in full-time
employment. Tr. 62-63.

On May 11, 2009, Gerald A. Gryczko, M.D., reviewed
Quildon's medical records and Dr. Vrabec's report on behalf of the
Bureau of Disability determination and concluded that Quildon had
the ability to engage in a limited range of light work. Tr. 451-
457.  Dr. Gryczko stated that Quildon could occasionally lift and
carry 20 pounds; frequently lift and carry 10 pounds; stand and/or
walk at least 2 hours in an 8-hour workday; sit about 6 hours in
an 8 hour workday; and had an ability to push or pull with the
extremities (other than limited to the weight designated for
lifting and carrying). Tr. 452.  Quildon could occasionally use
ramps and climb stairs but never climb ladders, ropes or
scaffolds; he could occasionally, balance, stoop, and kneel but
never crouch or crawl; he had no manipulative, visual or
communicative limitations; and with respect to environmental
limitations he had to avoid concentrated exposure to extreme cold,
wetness, humidity, fumes, odors, dusts, gases, poor ventilation
and hazards (such as machinery and heights). Tr. 453-454.

On May 20, 2009, Francis Murphy, Ph.D., a psychologist,
reviewed Quildon's medical records on behalf of the Bureau of

Disability determination and concluded that Quildon did not suffer
from a medically determinable severe mental impairment. Tr. 458-
470. Dr. Murphy indicated that Quildon suffered from depressive
symptoms but he could not determine whether they were caused by
the pain medications Quildon was taking or a depressive disorder.
Tr. 461. Dr. Murphy stated that Quildon had mild restrictions with
respect to activities of daily living; no difficulties maintaining
social functioning; no difficulties maintaining concentration,
persistence or pace; and no repeated episodes of decompensation,
each of an extended duration. Tr. 468. He further stated that
Quildon had no history of inpatient or outpatient psychiatric
treatment; Quildon was on no psychiatric medications and an
earlier assessment at the Pocono Medical Center in 2007 revealed
no previous psychiatric history, no depression, no psychosis and
no suicidal or homicidal ideations. Tr. 470.

        After the administrative law judge issued his decision,
Quildon submitted additional medical evidence to the Appeals
Council. Tr. 475-541.  Those records reveal examinations of and
treatment administered to Quildon before and after the ALJ's
decision.  Specifically, Quildon underwent physical therapy from
April through October, 2010. Id.  Quildon presented to Steven
Mazza, M.D., of CHC Professional Practice, P.C., on April 14,
2010, stating he "soon [was] being reevaluated for disability so

33

his attorney recommended [that he] restart] medical treatment and get reevaluated," and that he had not sought any treatment for over a year. Tr. 537.  Quildon reported that his neck and back pain were an "8" on a scale of 1 to 10, but that he was not taking any pain medication. Id.  Dr. Mazza observed that although Quildon moaned and grimaced during the range of motion examination, and even when performing simple movements, Quildon had full muscle strength, intact sensation, and a negative straight leg raise test. Tr. 539. Dr. Mazza refused to prescribe oxycodone, and recommended that Quildon stretch and exercise and referred him to physical therapy. Id.  Dr. Mazza informed Quildon that he could not offer any opinion regarding Quildon's ability to work. Id. Dr. Mazza told Quildon he would continue to treat him, but would need his prior medical records and diagnostic studies. Id. Quildon had follow-up appointments with Joseph Lee, M.D., one of Dr. Mazza's associates, on May 13, July 22 and August 19, 2010. Tr. 522-523, 527-528 and 532-534.  The records of these appointments do not reveal any substantial change in the objective physical examination findings. Id.  However, on August 19th Quildon reported that his neck was no longer bothering him and that the physical therapy was "helping him with his left hip but not as much with his low back." Tr. 522.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Quildon had not engaged in substantial gainful activity since December 29, 2006, the alleged onset date. Tr. 21.

At step two, the administrative law judge found that Quildon suffered from the following severe impairments: "degenerative disc disease of the lumbar spines, status post left medial ankle fracture, asthma and morbid obesity." Id.

At step three of the sequential evaluation process the administrative law judge found that Quildon's impairments did not individually or in combination meet or equal a listed impairment. Tr. 22.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Quildon could not perform his past semi-skilled, medium work as a bus driver and mail carrier but that he could perform a limited range of sedentary work. Tr. 22 and 28.  Specifically, the administrative law judge found that Quildon could perform sedentary work as defined in the regulations except he would be limited to occasional balancing, stooping, kneeling, and climbing ladders, scaffolds, ropes, ramps, and stairs; he would have significant difficulty crouching; he would have to avoid exposure

35

to cold, extreme damp/wet and humid environments other than on a
moderate basis; he had to avoid any concentrated exposure to
respiratory irritants such as fumes, odors, dust and gases and
poorly ventilated work settings; he had to avoid working at
unprotected heights and around hazardous machinery; he should not
work in a high volume or high intensity pace work environment; and
he had to have a sit/stand option at will or on a self-directed
basis. Tr. 22 and 58-59.  In arriving at this residual functional
capacity the administrative law judge found that Quildon's
statements about his pain and functional limitations were not
credible. Tr. 28.  The administrative law judge also rejected the
opinion of Dr. Vrabec to the extent that Dr. Vrabec indicated that
Quildon was limited to less than the requirements for full-time
work with respect to sitting, standing and walking. Tr. 27. The
ALJ also did not accept completely the opinion of the state agency
medical consultants who found that Quildon could perform light
work but gave Quildon the benefit of the doubt based on the
medical records and his testimony and reduced his residual
functional capacity to the sedentary level. Id.

At step five, the administrative law judge based on the
above residual functional capacity and the testimony of a
vocational expert found that Quildon had the ability to perform
work such as a visual inspector, bench assembler and surveillance

36

monitor, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 29.

The administrative record in this case is 541 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Quildon's medical history and vocational background in his decision. Tr. 19-302.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 7, Brief of Defendant.

Quildon argues that the administrative law judge erred by (1) rejecting the opinion of Dr. Vrabec, and (2) failing to properly assess his credibility.  Based on our review of the record, we find no merit in Quildon's arguments.

No treating physician indicated that Quildon was incapable from a physical standpoint of engaging in the limited range of sedentary work set by the administrative law judge on a full-time basis.  No treating physician after the alleged disability onset date of December 29, 2006, provided a functional assessment of Quildon's ability to sit, stand and walk.  Quildon's reliance on the assessment of Dr. Vrabec is misplaced. The ALJ was not required to accept the opinion of Dr. Vrabec, a non-treating physician who examined Quildon on one occasion.  The ALJ appropriately rejected Dr. Vrabec's restrictive opinion.  There is

substantial evidence in the record supporting the ALJ's residual functional capacity assessment, i.e., the opinions of Dr. Potera and Dr. Gryczko.  The administrative law judge's partial reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").  As stated above, the ALJ gave Quildon the benefit of the doubt and reduced Quildon's functional ability to the sedentary level.

        Quildon argues that the administrative law judge inappropriately judged his credibility, including his complaints of pain.  The administrative law judge stated that Quildon's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of sedentary work. The administrative law judge was not required to accept Quildon's claims regarding his limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to

be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Quildon when he testified at the hearing on May 7, 2010, the administrative law judge is the one best suited to assess the credibility of Quildon.

The ALJ was well aware of Quildon's work history from documents admitted into the record at the administrative hearing as well as from Quildon's testimony at that hearing. Also, it is clear that the ALJ was aware of the Functional Capacity Assessment of Quildon performed at St. Luke's Neuroscience Center on October 4, 2007, which revealed that Quildon put forth a very poor effort. Tr. 24. Furthermore, the ALJ noted the inconsistency of Quildon caring for his mother who suffered from Alzheimer's disease and Quildon's claim that he was totally disabled. Tr. 28. We see no reason to question the ALJ's credibility determination.

Finally, the evidence submitted by Quildon to the Appeals Council after the ALJ's decision is not a basis to reverse

the ALJ's decision or remand for further proceedings. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence.  Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. Quildon has not established "good cause" for not having incorporated the evidence into the administrative record. Furthermore, most of the records related to a time after the ALJ issued his decision and, consequently, are not material.

        Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.

We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


/s/ William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: April 8, 2014